FIRST BAPTIST CHURCH OF PARIS V. J. M. FORT ET AL.

No. 803.  Decided January 15, 1900.

1. **Independent Church Government—Status of Property—Dedication to Doctrine.**

Property of a church of strictly congregational or independent organization, acquired by purchase or donation charging it with no specific trust other than for the use of the congregation as a religious society, is not dedicated to the propagation of the particular doctrines adopted and held by the society at the time it was acquired. (Pp. 223-230.)

2. **Same—Schism—Departure from Doctrine.**

In the case of schism in such a congregation no inquiry can be had into the existing religious opinions of those who comprise the legal or regular organization; the proper inquiry is, which of the two factions constitutes the church, and those who adhere to the acknowledged organization are entitled to the use of the property, whether adhering or not to the doctrines originally professed. Watson v. Jones, 13 Wall., 679.  (Pp. 228-230.)

3. **Same—Cases Distinguished.**

The foregoing rule distinguished from that applying to property expressly devoted to the support or spread of some specific form of religious doctrine, and from the case of a religious body which is a subordinate member of some general church organization, subject to the control of superior ecclesiastical tribunals. (P. 227.)

4. **Church Subscription—Dedication to Trust—Presumption.**

In the circumstances under which subscriptions for procuring places of worship are commonly made in this country, no presumption can be indulged that the subscribers intended a condition that the house shall be devoted to the teaching of the peculiar views then professed by the members or declared by the body. (Pp. 225, 226, 229, 230.)

5. **Church Doctrine—When Courts Will Inquire.**

It is not within the province of the courts to determine which of two factions is right from a biblical or theological point of view, nor which conforms to the faith

originally adopted by the church, except where that is, in explicit terms, made a condition of the donation of property. (P. 230.)

**6.　Church Property—Adherence to Faith—Case Stated.**

A Baptist church, having adopted the "New Hampshire Confession of Faith," became incorporated and acquired a house of worship; thereafter a minority of the members, claiming that the majority had abandoned that faith, incorporated under the same name and sued to obtain possession of the building. Held, that the right to its use and control remained with the original organization, and the courts would not inquire whether it or its members adhered to the "New Hampshire Confession." (Pp. 220-230.)

**7.　Ruling Explained.**

The refusal of a writ of error by this court in Peace v. First Christian Church, 20 Texas Civil Appeals, 85, explained as an approval of the result reached in that case, but not of the views announced in the opinion. (P. 231.)

**8.　Pleadings—Foreclosure—Corporation.**

It was error to award foreclosure of a mortgage in a case where no such relief was asked by either party, and especially where the corporation made a party was held not to be identical with the one of the same name which owned the property. (Pp. 231, 232.)

Error to the Court of Civil Appeals for the Fifth District, in an appeal from Lamar County.

Suit was brought by the First Baptist Church and others, against Fort and others. Plaintiffs recovered, and upon reversal upon defendant's appeal obtained writ of error.

*James G. Dudley*, for plaintiffs in error.—Property thus acquired became a trust, for the promulgation and teaching of the doctrines and tenets upon which this particular church was organized, without specifying in the deed the particular doctrines that should be taught therein. Hale v. Everett, 53 N. H., 9; Miller v. Gable, 2 Denio, 492; Mt. Zion Baptist Church v. Whitmore, 83 Iowa, 138; Ferraria v. Vasconcellos, 31 Ill., 54; Kniskern v. Lutheran Church, 1 Sandf. Ch., 439; First Reform Presbyterian Church v. Bowden, 14 Abb. N. C., 356; Smith v. Pedigo, 32 Law. Rep. Ann., 846.

We understand the law to be that the religious doctrine, tenets, and faith of a particular church can not be abandoned or changed by a majority of its members, but those adhering to the doctrines and articles of faith upon which the church was organized constitute the church and are entitled to the church property. The articles of faith upon which the church was organized and the property acquired is a solemn compact, and when repudiated by any number of its members, they forfeit all right to the use or title to the church property. It was said by Sharswood, Justice, speaking for the Supreme Court of Pennsylvania, in Schnorr's Appeal, 67 Pennsylvania, 138, "in church organizations those who adhere and submit to the regular order of the church, though a minority, are the true congregation, and incorporation, if incorporated." Chief Justice Shaw announced the same doctrine in Stebbins v. Jennings, 10 Pick., 181. In Smith v. Pedigo, supra, the Supreme Court of Indiana reviews the case of Watson v. Jones, 13 Wal-

lace, 679, and especially the language of Judge Miller, which was used by the Court of Civil Appeals to support the holding in this case.

We respectfully invite the court's attention to the following authorities bearing upon the question: Mt. Zion Baptist Church v. Whitmore, 83 Iowa, 138; Smith v. Pedigo, 19 Law. Rep. Ann., 433, same case on rehearing, 32 Law. Rep. Ann., 838; Nance v. Busby, 18 S. W. Rep., 874; Rottmann v. Bartling, 22 Neb., 375; Baker v. Ducker, 79 Cal., 365; Roshi's Appeal, 69 Pa., 462; Lamb v. Cain, 129 Ind., 486; 20 Am. and Eng. Enc. of Law, 799, note 4.

*Hale & Hale*, for defendants in error.—The mortgage was valid, and the sale thereunder to the appellants valid, and passed the title to the property sold to the appellants, and the prior sale to appellees conveyed no title to them, because they failed to comply with their bid, and the pretended tender by them was not valid and not sufficient to entitle them to a conveyance of the property, because they had no right to give the receipt of the church, or to receive the excess of the bid over the amount of the Crittenden debt, and because the pretended tender was not unconditional and valid in law. Sayles' Civ. Stats., arts. 651, par. 4, 653, 665, 713; Olcott v. Gabert, 86 Texas, 124; Threadgill v. Pumphrey, 87 Texas, 577; Gordon v. Preston, 26 Am. Dec., 75. On tender, see 1 Dev. on Deeds, sec. 390; Perre v. Castro, 76 Am. Dec., 444; 18 S. W. Rep., 874; 22 Am. and Eng. Corp. Cases, 603, 604; Faulk v. Dashiell, 62 Texas, 642; 2 Perry on Trusts, 602-602f; Flake v. Nuse, 51 Texas, 102; Renard v. Clinck, 30 Am. State Rep., 459; McCalley v. Otey, 42 Am. State Rep., 89; Moynahan v. Moore, 77 Am. Dec., 476, note.

We presume it will not be denied that our courts have no ecclesiastical jurisdiction except so far as may become necessary to determine a property right, for all the authorities show that. The court determined that in this case it did have the ecclesiastical jurisdiction, because it was necessary to determine a property right, but we think it was error to so hold, remembering that this is not a suit between two factions of a church in reference to the ownership of property, or anything else, but a suit between a faction of a church and certain individuals in reference to the ownership of the property in controversy. The fact that appellants are members of the church can make no difference, for were they not members their rights would be no higher or lower than the present appellants, for they were acting, not for the church, so far as this suit is concerned, whatever may have been their intention with reference to the church after their title became fixed, as may be inferred from their permitting the church to use the house rent free since they bought it. This can make no difference, for the facts remain, and the court found that appellees were acting for themselves as individuals, and paid their individual money for the Crittenden note. Such being the status of the case, it seems to us that the court went beyond its jurisdiction in the determination of this case. The trust would not be permitted

to fail for want of trustees, even if all the trustees had abandoned the faith upon which the church was founded, and followed after Fortune and Fortuneism; it would have been the duty of the court to have appointed new trustees to take charge of the church property and preserve and keep alive the trust. Vernon Society v. Hills, 6 Cow., 23; People v. Peck, 11 Wend., 604; East Lake Church v. Halvorson, 42 Minn., 503; Bank v. Mfg. Co., 32 N. J. Eq., 236; Association v. Baldwin, 1 Metc. (Mass.), 359; Green v. Cady, 9 Wend., 414; Reformed Methodist Church v. Draper, 97 Mass., 349; McGargell v. Coal Co., 4 W. & S., 425; Mining Co. v. Bank, 104 U. S., 192; Smith v. Pedigo, on rehearing, 32 Law. Rep. Ann., 847.

If the power existed to mortgage the church property, and the deed of trust was legal and valid, so as to be a lien upon the property, the title to the property passed to and vested in plaintiffs in error, under the first sale by the trustee Spivy, and the Court of Civil Appeals erred in not so holding, as was held by the trial judge. Pierce v. Weaver, 65 Texas, 44; Carleton v. Roberts, 1 Posey, U. C., 587; Willis v. Smith, 66 Texas, 31; Shropshire v. Behrens, 77 Texas, 275; Rev. Stats. 1895, arts. 642, 651, 653, 677, 713; Fitzhugh v. Land Co., 81 Texas, 306; In re Church of the Messiah, 12 N. Y. Supp., 489; Gashwiller v. Willis, 33 Cal., 11-24; Baptist Church v. Baptist Church, 46 N. Y., 131; 1 Jones on Mort., sec. 128, note 2, and sec. 129; Perry on Trusts, secs. 733, 735, 737, 742-744. The reasoning of Judge Stayton in Perry Stove Mfg. Co. v. Lyons-Thomas Hardware Co. applies here. Galloway v. Hamilton, 68 Wis., 651; Griffin v. Blanchard, 17 Cal., 71; Angel & Ames on Corp., secs. 225, 226, 291, 295; 2 Kent. Com., 283.

*Dudley G. Wooten*, also for defendants in error.—The finding and the judgment of the trial court that the mortgage was invalid, because not attested by the corporate seal, and without being authorized by a majority of the church voting in regular session, are erroneous and unsupported by the facts or the law, and are moreover wholly immaterial and irrelevant, because the court held the debt and mortgage to be valid and enforcible by estoppel. 4 Thomp. on Corp., secs. 5045, 5051, 5052, 5083; Kerr on Fraud and Mistake, 420, note; Rev. Stats. 1895, arts. 4862, 651, 676, 713; 1 Jones on Mort., sec. 126; 1 Mora. on Priv. Corp., sec. 338; 2 Waterm. on Corp., 593; Rutland v. Paige, 24 Vt., 181; Green Co. v. Blodgett, 50 Am. St. Rep., 154; Olcott v. Gabert, 86 Texas, 124; Bond v. Terrell Mfg. Co., 82 Texas, 311; Threadgill v. Pumphrey, 87 Texas, 577; Railway v. Gentry, 69 Texas, 625; Bank v. Emery, 78 Texas, 498; Faulk v. Dashiell, 62 Texas, 642; Indianola v. Railway, 56 Texas, 594; Hess v. Dean, 66 Texas, 663; Miners' Co. v. Zellerbach, 99 Am. Dec., 300, and notes; Pixley v. Railway, 91 Am. Dec., 632 and notes; Gordon v. Preston, 26 Am. Dec., 75; 4 Thomp. on Corp., secs. 514, 5246, 5258, 3084.

The finding that plaintiffs were the legally constituted trustees of the church, or in any manner authorized to represent the corporation or

the congregation, so as to make the tender of the receipt a legal compliance with their bid, is not only not supported by the testimony, but is contrary thereto, inasmuch as the undisputed evidence demonstrated that they had rebelled against the rules and regular authority of the church, had been expelled from the church, held an illegal meeting in violation of the rules of the church, repudiated the charter and corporate existence of the body, and elected themselves trustees in violation of the church charter and the laws of the State. 1 Mora. on Priv. Corp., sec. 482; 1 Thomp. on Corp., secs. 706-717; Bernard Township v. Stebbins, 109 U. S., 349, 352; 1 Perry on Trusts, sec. 491; 2 Id., sec. 602, 602f; People v. Nappa, 80 Mich., 484; Church v. Hillery, 51 Cal., 155: American Prim. Soc. v. Pilling, 24 N. J. Law., 653; Prickett v. Wells, 24 S. W. Rep., 52.

Under the facts of this case there was no question of religious faith or Baptist doctrine involved, nor was there any such division of opinion in the church upon matters of essential religious belief and Baptist teachings as to amount to what the court found to be a fundamental variance between the two "factions," requiring the intervention of a secular court to adjust the property rights of a divided congregation. So far as the church difficulties were concerned, they arose upon the right of the majority to rule in the selection and retention of a pastor, which was a fixed written rule of the Paris church and is a historic and distinctive rule of Baptist church government; and so far as the case in court was concerned, it was simply an issue of law between the appellants as valid lienholders and the appellees as usurping seceders and expelled members from their own church. It is a question of church government, and not one of religious faith or property rights, so far as the church was concerned. 2 Beach on Corp., sec. 219, note 5; 1 Waterm. on Corp., 80-83; Bouldin v. Alexander, 15 Wall., 137; Stebbins v. Jennings, 10 Pick., 181; Baker v. Fales, 16 Mass., 503; McGinnis, v. Watson, 41 Pa. St., 13; Fulbright v. Higginbotham, 34 S. W. Rep., 875; Livingston v. Trinity Church, 45 N. J. L., 230; Baptist Church v. Witherell, 3 Paige Ch., 296; Russell v. Brazell, 49 Am. St. Rep., 542, 544; Watson v. Jones, 13 Wall., 680.

So far as any division of opinion existed in the church, it did not affect the original articles of faith upon which the church was organized, nor the essential doctrines of the Baptists, because no member of either faction ever repudiated those articles or denied those doctrines, but on the contrary the majority reaffirmed their allegiance to the original articles of faith twice after this controversy arose, and all along avowed their adherence to them. There was a dispute as to whether the pastor's preaching on some points was in accord with the articles of faith, but this did not amount to such a fundamental antagonism of religious principles as to create what is known in law as "a divided congregation," involving the interposition of a court to decide and adjust property rights and trust relations. Chase v. Cheney, 58 Ill., 509; White

Lick, etc., v. White Lick, etc., 89 Ind., 136; Lamb v. Cain, 129 Ind., 486; Nance v. Busby, 91 Tenn., 317; Bapt. Church v. Whitmore, 83 Iowa, 138.

BROWN, Associate Justice.—The First Baptist Church of Paris, joined by B. F. Fuller, Stuart Lee, S. H. Webb, W. F. Edwards, J. C. Hunt, R. M. Miller, and J. B. Johnson, who sue as trustees of the said church and in their own right as members thereof, instituted this suit in the District Court of Lamar County against J. M. Fort, B. W. Lewis, S. B. M. Long, Mrs. M. C. Maxey, F. I. Williams, T. S. Preston, M. C. Spivey, G. M. Fortune, and the executors and heirs of Mrs. Emily Williams, deceased, naming them. Plaintiffs sought to recover the possession of certain church property, consisting of the building and lot located in the city of Paris, Lamar County, Texas, and to cancel certain conveyances named therein, and to restrain the defendants from interfering with plaintiffs' possession of the church property.

The petition sets up the facts with regard to the original organization of the church, the building of the house upon the lot acquired for that purpose, and the facts and circumstances which brought about a division among the members of the said church, charging that the defendants and their adherents, a majority of the members, had departed from the original confession of faith adopted by the church in its organization, and had diverted said property from the purposes to which it was dedicated; and that the plaintiffs and those represented by them, a minority of the said congregation, had adhered to the original confession of faith, and were, in fact, the First Baptist Church of Paris and entitled to the possession of the said property. The case was tried before the court without a jury and the following conclusions of fact were filed, upon which judgment was entered for the plaintiffs below.

"1. The court finds that this church was originally organized in about the year 1854, under the name of the United Baptist Church, and adopted, as its articles of faith and covenant, the articles of faith and covenant introduced in evidence, known as the New Hampshire Confession of Faith.

"2. The court finds that on the 10th day of April, 1861, the lot in controversy upon which a church building had been erected was deeded to Lemuel H. Williams, Goodman Tucker, and Hardy Moore, trustees for said church, under and by the name of the Paris Baptist Church, to have and to hold under them and their successors, as a place of worship for said Paris Baptist Church, and said church and the members thereof continued to hold religious worship on said lot and in said church building under the name of the Paris Baptist Church, and upon the articles of faith and covenant upon which it was originally organized until it became incorporated on the 21st of March, 1890, under the general incorporation laws of Texas, when it was incorporated under the name of the First Baptist Church of Paris, and afterwards erected upon said lot their present church building at a cost of about

$20,000; that in order to complete said building or church, the said First Baptist Church of Paris borrowed of one S. D. Crittenden the sum of $5000, and executed by and through some of its trustees a note for said amount, and a deed of trust or mortgage on the said church property to secure the payment of the same.

"3. The court finds that the trustees of the said First Baptist Church of Paris named in its charter were U. Hearon, F. I. Williams, B. F. Fuller, Stuart Lee, Samuel H. Webb, T. S. Preston, and Ira Webster; that said mortgage or deed of trust was executed to M. C. Spivey, trustee, by B. F. Fuller, T. S. Preston, Stuart Lee, and W. F. Edwards as trustees of said First Baptist Church of Paris; that said W. F. Edwards had been elected trustee by said church to fill a vacancy caused by the resignation of U. Hearon.

"4. The court finds that the First Baptist Church of Paris had power to mortgage said property, but that the said deed of trust was invalid because not executed as required by the statutes of Texas, under the seal of the corporation, and for the further reason that said deed of trust was executed without having been authorized by a majority of said church, voting in regular session, as provided by its charter; but, however, the court finds that the said First Baptist Church of Paris is estopped from denying the validity of said deed of trust because it obtained the money and used the same in the completion of its church on the faith of said deed of trust and afterwards ratified the same, and by bidding the property in at the sale under said deed of trust.

"5. That said church, from its original organization up to about the time of the completion of its church building in 1895, continued to worship and hold religious services upon the articles of faith and church covenant upon which it was organized, when dissensions arose among the members of said church over the teachings and preaching of its then pastor, one G. M. Fortune; that said Fortune, by his preaching and published sermons and articles, denied the full inspiration of the Scriptures, and denied and repudiated the vicarious atonement of Christ for sinners, and denied that Christ died for and instead of sinners and became their substitute, and denied that Christ's righteousness was imputed to the righteous, all of which was contrary to the doctrines and teachings of the Baptist Church and contrary to the articles of faith upon which this church was organized and had continued to worship since its organization.

"6. The court finds that at the time said dissensions arose the membership of the First Baptist Church of Paris was about four hundred. That said dissensions continued to grow until the church was divided into two factions, one faction adhering to the doctrines, teachings, and preaching of the said G. M. Fortune, and the other faction standing by and adhering to the doctrines of the Baptist Church and the articles of faith upon which the church was organized. That the faction which adhered to the original articles of faith and the doctrines and teachings of the Baptist Church, which faction is, for convenience, herein-

after styled the anti-Fortuneites, strenuously opposed the re-employment of·said Fortune as pastor of said church, and, after he was employed, insisted upon his resignation because of his doctrines; but at the several metings when these matters came up and were discussed and passed upon, the faction which adhered to the doctrines of said Fortune (which faction is hereinafter styled, for convenience, the Fortuneites), had a majority of the members present and voting and refused to request the resignation of said Fortune and refused to accept his resignation when offered by him, and re-employed him as pastor for an indefinite period of time. That some time in the month of July, 1896, said Fortune tendered his resignation as pastor of the First Baptist Church of Paris, which was accepted by the Fortuneites, and that about the 30th of August, 1896, said Fortune rented a hall in the city of Paris and delivered therein a series of sermons and lectures in opposition and criticism of the creed. of the Baptist Church, which were attended by his adherents; that during this time anti-Fortuneites continued to meet and hold services and Sunday-school in the First Baptist Church building until Sunday next preceding the 6th day of October, .1896, when the church doors were locked and the windows barred by the Fortuneites.

"7. The court finds that on the 30th of September, 1896, the anti-Fortuneites, representing and acting as the First Baptist Church of Paris, met in church session at the church building and elected the following persons, members of said church, to fill vacancies in its board of trustees, to wit, J. C. Hunt, J. B. Johnson, R. M. Miller, and ·George T. Saunders (which last named trustee subsequently resigned), and by resolution, authorized and directed said trustees to borrow money and pay off said indebtedness to said S. D. Crittenden, or buy said church property at the sale under the said deed of trust, which was then advertised for October 6, 1896, for the said First Baptist Church of Paris, and to do anything else that in their judgment might be necessary for the interest of said church.

"8. That on the 6th of October, 1896, and before the sale under the aforesaid deed of trust, the said trustees of the First Baptist Church of Paris, acting for said church, procured the money and offered to pay to M. C. Spivey, trustee in the deed of trust, the full amount of the note, principal and interest and commissions, if any, if he would transfer to them the note and mortgage, or deliver to them said note and mortgage without transfer, which offer was refused by the said Spivey, and the church property was put up and offered for sale by the said trustee Spivey, under the deed. of trust,.at public outcry, to .the highest bidder for cash, and the plaintiffs' trustees, the said trustees of the First Baptist Church, for and on behalf of said church, being the highest and best bidder, the property ·was knocked off to them for the sum of $10,050, and thereupon said trustees of the First Baptist Church of Paris, for and on behalf of said church, tendered to said trustee Spivey, in cash, the full amount of the Crittenden note, secured by the deed

of trust, principal and interest, costs and commissions, if any, amounting to $5378, and a receipt, signed by them as trustees of the First Baptist Church of Paris for the balance of the bid over and above the said note, principal, interest, and commissions, and that thereupon the said M. C. Spivey, at the instance of and upon demand made by T. S. Preston and F. I. Williams, two of the charter trustees of the First Baptist Church and adherents of Fortune, that he, the said Spivey, require payment of the whole amount of said bid of $10,050 in cash, and that if not so paid, Spivey resell said property, he, the said Spivey, refused the said tender, and proceeded to resell said property, which second sale was forbidden by said trustees of the First Baptist Church of Paris. At said second sale, J. M. Fort, F. I. Williams, B. W. Lewis, S. B. M. Long, Mrs. Emily Williams, and Mrs. M. C. Maxey became the purchasers at the sum of $5000, being less than the amount of the Crittenden note, which was credited thereon by the said Spivey, and said Spivey made them a deed to the church property.

"9. The court finds that before the sale of said church property by the said Spivey, and before the Crittenden note became due, the said purchasers under the second sale had bought up the Crittenden note and the sale by Spivey was directed by them, and the said purchasers were all members of the said First Baptist Church (some of them trustees) and adherents of Fortune; that as soon as the aforesaid defendants bought in said church property and got a deed to it from said trustee Spivey, the said G. M. Fortune was called back to preach in said church by the Fortuneites as a supply, and continued to preach in said church until about the 25th of July, 1897, and the anti-Fortuneites, or the adherents to the original articles of faith, were thereby excluded from holding services in said church building under the teachings and instructions of a pastor of the original Baptist faith, and since their exclusion, have held religious worship as the First Baptist Church of Paris in the Aiken Institute and Meyer's Hall.

"10. The court finds that the faction of the church styled the anti-Fortuneites and who adhered to the articles of faith upon which the church was organized and the doctrines and teachings of the First Baptist Church, were and are the First Baptist Church of Paris, and that the plaintiffs' trustees were and are the legal trustees of said First Baptist Church of Paris, and that they acted for the said First Baptist Church of Paris in trying to save the church property and secure it for said church at the trustee's sale, and that the said purchasers of said property, at the second sale by Spivey, were acting for themselves and not trying to secure said church property, and were not acting for the said First Baptist Church of Paris."

The case of the plaintiffs in error depends upon the correctness of the following proposition, submitted as the first assignment of error in this court:

"The Court of Civil Appeals erred in holding that the church property in controversy was not trust property; because when the property

was acquired by the church, under its then name, 'Paris Baptist Church,' the title was vested in three trustees and their successors for the sole and exclusive use of said church as a place of worship. The property thus acquired by denominational name became a trust for the promulgation of the tenets and doctrines of that particular denomination, without any specific declaration of the particular doctrines and teachings that should be taught or advanced. Moreover, the evidence in the record and the findings of the trial judge show conclusively the fundamental doctrines of the Baptist denomination on the subject of the vicarious atonement of Christ for sinners and the full inspiration of the Scriptures, and that this church had been organized upon these doctrines, set forth at the time the church property was acquired."

The findings of fact and the undisputed evidence establish that on the 10th day of April, 1861, there was in existence in the city of Paris, Texas, a church known as the Paris Baptist Church, to which Milton Webb, N. W. Towns, and T. C. Poindexter on that day conveyed the lot on which the church house in question is situated, by a deed made and delivered to "Lemuel H. Williams, Hardy Moore, and Goodman Tucker, trustees of the Paris Baptist Church, and their successors, for the use of the said Paris Baptist Church." The deed contained the following habendum clause: "To have and to hold unto the said L. H. Williams, Hardy Moore, and Goodman Tucker and their successors, for the sole and exclusive use and benefit of the said Paris Baptist Church." At its organization and before the making of this deed, the church had adopted what is known as the New Hampshire Articles of Faith. A church building was erected upon the said lot and paid for by subscriptions from the members of the church and others. There is nothing to show that any subscriber attached any conditions to his subscription or prescribed any terms upon which it should be used.

The Paris Baptist Church was an independent body having no ecclesiastical superior and might have organized by adopting the Philadelphia Confession of Faith, or might have had its articles of faith written out to suit the members, or might have organized without adopting a declaration of faith. The Bible is received as the creed of the Baptist Church, whether any be adopted or not.

It is claimed by the plaintiffs that upon the conveyance of the lot to trustees for the use and benefit of the "Paris Baptist Church," there attached to the property a trust that it should be used for the propagation and support of the faith professed by that church and expressed in the articles of faith adopted by it before the conveyance was made and then in force; and that the minority which adhered to the articles of faith adopted by the church at its organization constitute the "Baptist Church of Paris," for the use of which the lot was conveyed,—now the "First Baptist Church of Paris." In support of the proposition, plaintiffs cite the following cases: Hale v. Everett, 53 N. H., 71, 16 Am. Rep., 118; Blanc v. Alsbury, 63 Texas, 489; Smith v. Pedigo, 32 L. R. A., 844; Miller v. Gable, 2 Den., 492; Ferraria v. Vasconcellos, 31 Ill., 54;

Bowden v. McLeod, 1 Edw. Ch. (N. Y.), 588; Morville v. Fowle, 144 Mass., 109. Smith v. Pedigo and Mt. Zion Baptist Church v. Whitmore, 13 Lawyers' Reports Annotated, 198, sustain the judgment of the trial court in this case. Both cases practically hold that a church, independent of any other organization, may adopt a confession of faith by a majority vote which will bind them and all members who may unite with them thereafter; and that no change can be made except by the unanimous consent of the entire membership. The reasoning by which this conclusion is reached is not satisfactory to us.

In Hale v. Everett, 53 New Hampshire, 9, the court uses language broad enough to cover all that is claimed by the plaintiffs, but the point decided is against them. The learned judge who wrote that opinion took a wide field for discussion and most of the propositions discussed are irrelevant to the issue before that court. In that case, a society had been organized by the name of the "First Unitarian Society of Christians in Dover." The majority had organized another church, and were not in any sense the beneficiaries named in the deed. The court held that the use of the term "Unitarian Christians" necessarily excluded any organization or church that promulgated doctrines which denied the divinity of Christ, and upon the two grounds that the majority were not Christians, and had organized another body, they were denied the right to hold under the deed.

The opinion of the court in the case of Ferraria v. Vasconcellos, 31 Illinois, 25, does not support the proposition to which it is cited; it, in fact, decides nothing except that both factions had the right to do as they did and decreed a division of the property. Chief Justice Caton, however, delivered a separate opinion, in which he broadly lays down the proposition contended for by plaintiffs in the following terms: "Church property is rarely paid for by those alone who there worship, and those who contribute to its purchase or erection are presumed to do so with reference to a particular form of worship, or to promote the promulgation or teachings of particular doctrines or tenets of religion, which, in their estimation, tend most to the salvation of souls; and to pervert the property to another purpose, is an injustice of the same character as the application of other trust property to purposes other than those designed by the donor." We think it is correctly assumed as a matter of common knowledge that in this country houses for religious worship are usually built by subscription, not confined to the membership of the particular church or denomination, but, in fact, members of all denominations, as well as those who belong to no church, contribute freely to the erection of such buildings. Upon this fact is based the presumption asserted by Judge Caton, that each donor contributes with the distinct purpose that the house shall be dedicated to the propagation of the faith then professed by the congregation for which the structure is to be built; out of the facts presumed springs the asserted trust relation between the donor and the church. It is not claimed that a con-

gregation of Baptists who organize themselves into an independent church and adopt articles of faith by a majority vote thereby bind themselves to adhere to the articles so adopted for all time; if, however, they should afterwards take up a subscription for the purpose of building a house of worship or receive donation of a lot, under the doctrine asserted by plaintiffs, the articles already adopted would become immutable and the church be deprived of the power to change or modify that declaration, for beneficiaries can not abolish a trust without consent of the donor, though they be unanimous in the wish. If the proposition be sound, it results that before buying the lot or building the church for the Paris Baptist Church, a majority of that congregation could have abolished the New Hampshire Confession of Faith, and could have adopted the Philadelphia confession, or could have substituted a confession drafted by themselves, or they might have abolished all articles of faith and have relied upon the Bible alone as their creed. But, when the deed was made to the lot and the house built by subscription, the right to change or repeal the articles of faith was taken away from the congregation, and to change it would not only forfeit their rights in the property, but would deprive them absolutely of their membership and good standing in the church, which, to a Christian, is of greater value than houses or lands.

The presumption involves the absurdity that a Methodist who contributed to the building of the house of worship for the Paris Baptist Church did so for the express purpose of perpetuating and promulgating the doctrine that *immersion* alone is baptism and that infants are excluded from the rights of the church. The contributing Jew—they are not few—is presumed to be especially anxious that the Messiahship of Christ should be taught, though the failure to believe it cast down his temple and broke down the walls of his holy city, making his people wanderers upon the earth. If the majority of such a congregation should be converted to the belief that sprinkling is valid baptism and so change their teachings and practice, the Methodist brother who aided to build the house could interfere and say "No, you must teach immersion as the only valid mode, because my gift was based upon your continuance in teaching that error." Or, if the majority should abandon their faith in Christ as the Messiah and change their teaching, as did the Unitarians in Hale v. Everett, the Jew contributor could say, "Nay, you must not abandon your doctrine, because my donation binds you to teach the divinity of Christ, although false in fact." If a member of another Baptist church which adopted the Philadelphia confession contributed, he might enjoin the church at Paris from abolishing the existing articles and adopting that which his own church indorsed. The soundness of the teachings is not involved in the proposition; error is perpetuated the same as truth. Courts can not decide between conflicting opinions upon theological questions. The fallacy lies in presuming the existence of a purpose of which there is no proof, and in binding the

minds and consciences of men by the presumed secret intentions of those persons who aid in such enterprises.

In the case of Watson v. Jones, 13 Wallace, 679, Justice Miller, in a very clear opinion, brought order out of the chaos which reigned among the decisions upon this subject and expressed the true doctrine in the following manner:

"The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies, may, so far as we have been able to examine them, be profitably classified under three general heads, which of course do not include cases governed by considerations applicable to a church established and supported by law as the religion of the State.

"1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.

"2. The second is when the property is held by a religious congregation, which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.

"3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization."

We believe that this classification fully and fairly presents the result of previous decisions of the courts upon this question. The opinions of learned judges are of great length, and varied in the subjects discussed, but the points at issue and decided in the cases that we have been able to examine are fairly represented by Judge Miller's statement. This case comes distinctly within the second class.

As applicable to the question before the court, we quote further from that opinion as follows:

"The second class of cases which we have described has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government; and to property held by such church, either by way of purchase or donation, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society.

"In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such

cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property. The minority in choosing to separate themselves into a distinct body and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation. This ruling admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization; for, if such were permitted, a very small minority, without any officers of the church among them, might be found to be the only faithful supporters of the religious dogmas of the founders of the church. There being no such trust imposed upon the property when purchased or given, the court will not imply one for the purpose of expelling from its use those who by regular succession and order constitute the church, because they may have changed in some respect their views of religious truth." In support of this position, we cite Bouldin v. Alexander, 15 Wall., 131; Cox v. Walker, 26 Me., 504; Shannon v. Frost, 3 B. Mon., 253; Gibson v. Armstrong, 7 B. Mon., 481; Harper v. Straws, 14 B. Mon., 48; Presbyterian Congregation v. Johnson, 1 Watts & S., 9; McGinnis v. Watson, 41 Pa. St., 9; Harmon v. Dreher, 1 Speers' Eq., 87; Miller v. Gable, 2 Den., 492; Hendrickson v. Decow, 1 Saxton's Ch., 577; Bowden v. McLeod, 1 Edwards' Ch., 588.

The First Baptist Church of Paris is a corporation created under the laws of the State of Texas and is the successor of. the Paris Baptist Church, to the use of which the deed for the property in question was made. Under the rule laid down in the case of Watson v. Jones, which we approve, the proper inquiry is, which of the two factions constitutes the First Baptist Church of Paris? To test this question, the courts can not examine the members of the two parties to ascertain what their beliefs are upon any given theological question, but must decide upon the legal phases of the case. In the case of Harper v. Straws, before cited, Chief Justice Marshall of the Supreme Court of Kentucky, said: "The true question is, which of these congregations is the society which worshiped at Asberry Chapel, that is, in the house at the corner of Fourth and Green streets, at and after the date of the deed conveying the property to that society? It is a question of identity, not of individuals, but of the body. And, as the deed makes no reference to the connection of the beneficiaries with any other church organization as essential to their rights, the continuance of the connection which existed at its date can not be regarded as entering into the question of identity by which it is to be determined who are the beneficiaries. That question is to be determined by reference to the acts and internal organization of the body itself." The facts show that the plaintiffs, as they now claim to be organized, were not a separate body existing at the time the deed was made nor when the charter of the church was procured, but were members of the

congregation which worshiped in the house in question. Upon a question of faith and adherence to the original articles of faith, the plaintiffs, a minority of the members, assumed that they alone adhered to the original confession of faith and organized themselves into a body under the same name as that borne by the church to which they had formerly belonged. In doing so, they did not become the incorporated church, but constituted themselves into an independent voluntary organization. Of a proceeding similar to this, Chief Justice Marshall, in the case of Harper v. Straws, said: "When this proceeding took place, the old Asberry Chapel, considered as the place of worship referred to in the deed by which it was conveyed, had ceased to be a place of worship. But the society which had worshiped there until it was taken by the Masons, continued to exist as an organized society of Christians, forming a congregation with the same officers, the same pastor, and the same records. The party which felt itself driven to reorganize in the old organization had never before been an organized body or society of Christians, and, notwithstanding the assumption of the old name and the mystery of reorganizing in the old organization, it can not be that while the old organization remained complete and distinct and competent to the performance of its proper functions and to the enjoyment of its rights, it could be merged in or superseded by this new organization. The movement indicated by these resolutions was revolutionary. Those who participated in it, if they had, up to that time, been members of the society which had worshiped at Asberry Chapel, acted in this measure of reorganization independently of that society, threw off its authority, and renounced their connection with it. They formed, in fact, a new society which, whatever name, form, or right it might assume or claim, had never, as a society, worshiped at Asberry Chapel. * * * By their secession, they ceased to be members of it, and being, therefore, no longer within the description of the grantees or beneficiaries of the deed, they ceased to have any interest in the title or the use." It is not claimed that the defendants abandoned their organization as the First Baptist Church of Paris, but the findings of fact establish conclusively that the church organization, as it existed prior to the division, continued and that plaintiffs entered into a new organization, upon the ground that the defendants had abandoned the faith and thereby forfeited their rights in the church property.

The presumption upon which the supposed trust is based belongs to the class known as disputable presumptions of law, which are "the result of the general experience of a connection between certain facts or things, the one being usually found to be the companion or the effect of the other." 1 Taylor Ev., sec. 109; 1 Greenl. Ev., sec. 33. Before accepting the presumption as a rule of decision, it is well to examine its foundation and ascertain if it is well grounded in fact. Is it the general experience of men that persons who subscribe to a fund to build a church have in their minds a condition that the house shall be devoted to the teaching of the peculiar views then professed by the members or declared by the

body? If we recur each to his own experience, we will not recall a case in which this was known to be true. If we consult each his own purposes, when making like contributions, the result will be the same,—no such intent existed in our own minds. In the examination of this question, we have not found a case in which the donor of property for church purposes or a subscriber to such a fund has sought to enforce the trust, either when it was expressed in some instrument or in those cases where a trust has been presumed by the courts; but, in every instance, the action has been by a faction of the congregation, which, failing to control the church, sought the interposition of a court to decide their doctrinal differences in order to control the property of the church. The fact that no subscriber to a church fund has sought in the courts of any State to enforce the observance by a church of the faith professed by it at the time his donation was made and that our own experiences do not attest the existence of such conditions, show that the supposed purpose does not generally exist in the minds of those who subscribe to these enterprises. The presumption of such intent discredits the public spirit and liberality of our people, who, whether Christians or not, when called upon to aid in such enterprises, do not stop to inquire into the particular religious belief of the congregation; neither does the continuance in a particular doctrine concern them; they are actuated by the more laudable purpose of advancing the cause of Christianity.

It is not within the province of courts to determine which of two factions is right from a biblical or theological point of view, nor which conforms to the faith originally adopted by the church, except when that is in explicit terms made a condition of the donation. Granting that the defendants have abandoned the New Hampshire Confession of Faith, the rules of that church prescribed that a majority should control. The minority took membership with those rules in force and must abide the result. In Miller v. Gable it is said: "If any class of our citizens are of opinion that spiritual blessings can only flow in a particular channel; if the church or a creed in their minds usurps the place of the revelation upon which they suppose them to be founded, and if such persons found churches, they must declare their opinions explicitly, to have them respected. Such was not the belief of the plain men who established this church. They have left enough on record to show that they were anxious that the essential truths of Christianity, which were recognized by the great body of the reformers of that day, should be preached to them and to their children. This has been done. If we go farther and bind this church to a particular creed and compel a reluctant submission to a judicatory whose authority they have renounced, it will, in my opinion, be the act of this court, and not that of the founders of the charity. I am of opinion that the decree appealed from should be reversed." And Judge Miller expressed the same thought in Watson v. Jones, in the extract before made, of which we repeat this forcible sentence: "There being no such trust imposed upon the property when purchased or given, the court will not imply one for the purpose of ex-

pelling from its use those who by regular succession and order consti-
tute the church, because they may have changed in some respect their
views of religious truth."

In support of the judgment of the District Court, the plaintiffs in
error cite the case of Peace v. First Christian Church of McGregor, in
which this court refused an application for writ of error from the judg-
ment of the Court of Civil Appeals of the Third District. The trial
court, in that case, found that the majority of the congregation ."per-
mitted only its principles and doctrines to be taught in the church and
its customs and usages to be followed, and would not permit those ad-
hering to and holding a doctrine with the progressive faction (the mi-
nority) to hold religious services or preach their principles and doc-
trines in the church building," and that "on September 23, 1897, defend-
ants G. A. Trott and R. M. Peace, elders as aforesaid (of the majority),
locked the church house and took possession thereof for themselves and
the other defendants, all of whom adhered to the firm foundation faction
(the majority), claiming that they are the original Christian Church
of McGregor, and defendants now hold exclusive possession of the
church property against the plaintiff corporation and those composing
said corporation." The court also found that the minority organized
a corporation in the name of the First Christian Church of McGregor,
which was the plaintiff in that case. It was the opinion of this court,
on examining the application for writ of error, that without regard to
the differences of opinion which prevailed between the members of the
congregation, the majority had no right to exclude the minority from
the use of the building so long as the latter were not dismissed from
membership in the church, and that the effect of the judgment in favor
of the corporation was to restore the building to the use of the whole
church. Upon this ground the application was refused, and not because
this court approved of the opinion filed by the trial judge which was ap-
proved by the Court of Civil Appeals, holding that the majority had de-
parted from the faith and that therefore the minority constituted the
original church. We may have been in error as to the effect of the
judgment in this respect, because it may be true that the action of the
minority in that case amounted to an abandonment of their membership
in the original church by which they lost their rights in the property,
which was deeded to the original organization, and that the corporation
did not include the majority; if so, the writ of error should have been
granted. But the case is not authority upon the questions involved in
this.

The plaintiffs in error assign that the Court of Civil Appeals erred in
entering a judgment foreclosing the deed of trust upon the church prop-
erty and ordering the property to be sold. This assignment is well
taken. Neither party to this suit sought a foreclosure of the deed of
trust and sale of the property, and there was no pleading to sustain
the judgment of the court; besides, the incorporated "First Baptist

Church of Paris," which owned the property, was not a party to the suit and could not be bound by the judgment. "The First Baptist Church," which was joined by the plaintiffs in error, was a voluntary association formed by the minority of the church which could not, by using the name of the incorporated church, appropriate a charter that had already been granted by the State, and under which there was an existing organization. The judgment of the Court of Civil Appeals is affirmed in so far as it reverses the judgment of the District Court and in all other respects it is reversed.

Proceeding to enter such judgment as the Court of Civil Appeals should have entered upon the facts found by the District Court, it is ordered that the plaintiffs in error take nothing by this suit, and that the defendants in error go hence without day and recover of the plaintiffs in error, B. F. Fuller, Stewart Lee, S. H. Webb, W. F. Edwards, J. C. Hunt, R. M. Miller, and J. B. Johnson, all costs expended in all of the courts.

*Reversed and rendered.*